Bert L. SHANNON, Appellant,

v.

CITY OF ANCHORAGE, a municipal
corporation, Appellee.

No. 1186.

Supreme Court of Alaska.

Dec. 31, 1970.

James K. Tallman, Anchorage, for appellant.

Daniel A. Moore, Jr., of Delaney, Wiles, Moore, Hayes & Reitman, Inc., Anchorage, for appellee.

OPINION

Before BONEY, C. J., DIMOND, RABINOWITZ and CONNOR, JJ., and FITZGERALD, Superior Court Judge.

RABINOWITZ, Justice.

This is the second time that this matter is before the court. On the first appeal, we held that the superior court erroneously dismissed appellant's action for failure to state a claim upon which relief could be granted.[1]

In reaching this conclusion, we held that the allegations of appellant Shannon's complaint to the effect that appellee city of Anchorage was negligent in failing to fulfill its duty of furnishing Jacob's ladders for the use of appellant stated a claim for relief.[2] In our opinion we also referred to appellant's deposition and affidavit in which he asserted that the city of Anchorage had customarily provided Jacob's ladders for vessels using its dock facilities. In regard to these allegations, we said that

> if the allegations of appellant as to custom and practice are true, appellee may have assumed a duty toward persons on vessels using its dock to provide a reasonably safe means of access to the dock, and that appellee may not relieve itself of that duty by failing to perform it without exposing itself to liability for injuries such as those suffered by appellant. We find that there may be such a continuing duty to act because of the relative positions of the parties—as a matter of practicality and common sense safe means of access to appellee's dock cannot reasonably be furnished by one in appellant's position at all stages of the tide but can readily be furnished by appellee.[3]

Upon remand the case was tried before a jury on the theory that in order to recover appellant had to prove, in part, that appellee's duty of care to provide access to its dock arose from its custom and practice of furnishing Jacob's ladders for vessels

1. Shannon v. City of Anchorage, 429 P.2d 17 (Alaska 1967).

2. *Id.* at 19.

3. *Id.*

and crewmen who used its dock.[4] The jury returned a general verdict in favor of the city of Anchorage against Shannon. In answer to interrogatories which were propounded, the jury stated that the evidence did not establish a custom or practice on the city's part of furnishing Jacob's ladders as a means of access to its dock; that the evidence failed to show, as a matter of "practical necessity" that the city was the only one able to furnish Jacob's ladders as a means of access to the top of the dock under circumstances substantially similar to those present in the case at bar; that under the evidence the city was not negligent in failing to provide appellant with a Jacob's ladder as a means of access; that appellant Shannon was contributorily negligent and that his own negligence was a proximate cause of the injuries which he sustained. Shannon now brings this appeal from the judgment which the trial court entered dismissing his action on the merits.

In his appeal, Shannon advances numerous specifications of error in which it is asserted that the trial court erroneously failed to apply the Jones Act, as well as general admiralty law, in its charge to the jury; that the interrogatories which were propounded were overly restrictive and misleading; that the interrogatories and general verdict were inconsistent; that the court's instruction on the issue of duty arising from establishment of custom was too restrictive; and that the trial court erroneously submitted the issue of Shannon's contributory negligence to the jury for determination. Although we are of the view that several of appellant's specifications of

error are meritorious, we nevertheless think that the superior court's judgment of dismissal should be affirmed.

Appellant Shannon was a merchant seaman on the ALASKA ROUGHNECK, a supply tug owned by Foss Launch and Tug Company which was operating in the waters of Cook Inlet. On April 7, 1963, shortly after 7 p. m. near high tide, the ROUGHNECK towed Foss Barge Number 99 to the Anchorage city dock. The barge was tied to the south end of the city dock and the ROUGHNECK was tied up on the side of the barge away from the dock. At approximately 10 p. m., due to the captain's concern regarding floating ice coming in from Knik Arm, measures were taken to secure the vessels with additional lines. In order to secure the tug and barge with more lines, Shannon placed a straight wooden 18-foot ladder from the barge to the top of the dock and began to climb it. A fellow crew member braced the bottom of the ladder with his feet. In the course of Shannon's ascent, the barge shifted due to the tidal currents, ice, or combination of both, the ladder slid off the top of the dock, and Shannon fell some 25 feet onto a floating camel log located between barge and the dock.

In this appeal, Shannon argues that because he was a seaman injured on the sea in the course of his employment, the Jones Act[5] and general admiralty law is controlling, and he therefore may recover under tort or admiralty theory. The city of Anchorage takes the position that appellant's Jones Act action could only be brought against his employer, Foss Launch and Tug

---

4. The judge gave this instruction to the jury:

> You are instructed that the defendant had a duty to exercise reasonable care to provide the plaintiff with a means of securing access to the top of the Port of Anchorage dock only if the plaintiff proves by a preponderance of the evidence, as that terms has herein been defined, that:
>
> 1. The defendant had in the past followed an established custom of providing Jacob's ladders as a means of access to the top of the Port of Anchorage dock,

at all hours of the day, at all stages of the tide, and under any weather conditions prevailing at the time and under circumstances substantially similar to those involved in this case, and

> 2. As a matter of practical necessity, the defendant was the only individual so situated as to be able to furnish Jacob's ladders as a means of access to the top of the Port of Anchorage dock to individuals under circumstances substantially similar to those involved in the present case.

5. 46 U.S.C. § 688 (1952).

Company, and that admiralty law is inapplicable because the accident did not occur on navigable waters but on land.[6]

Under article III, section 2 of the United States Constitution federal judicial powers are extended to "all cases of admiralty and maritime jurisdiction." Section 9 of the Judiciary Act of 1789, which implemented this constitutional grant, provided that:

> [T]he district courts * * * shall also have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction * * * saving to suitors, in all cases the right of a common law remedy, where the common law is competent to give it * * *.[7]

■ This statute reserves to the federal courts in admiralty exclusive jurisdiction over *in rem* admiralty actions, that is, claims in the nature of maritime liens to be enforced usually against vessels. Generally, the "saving to suitors" clause means that a suitor asserting an *in personam* admiralty claim may elect to sue in a "common law" state court through an ordinary civil action.[8] In such actions, the state courts must apply the same substantive law as would be applied had the suit been instituted in admiralty in a federal court.[9] Thus, in the case at bar, for the superior court to have been correct in its rejection of admiralty law, the case must not be one within admiralty jurisdiction.

■ Admiralty jurisdiction provides "fairly complete coverage of the primary operational and service concerns of the shipping industry, with a few anomalous exceptions." [10] Suits for personal injuries to seamen while aboard vessels on navigable waters generally fall within admiralty jurisdiction. The Jones Act provides for recovery by a seaman for injuries in the course of employment. This act reads in part:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply * * *. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.[11]

■ The case law has made it clear that seamen may bring saving to suitors clause suits under the Jones Act in state courts.[12] Apparently maritime rules of substantive law, as modified by the Jones Act, apply in saving clause cases in state courts under the Jones Act.[13] In the case at bar, appellant contends that Jones Act actions lie against non-shipowner third party tortfeasors as well as shipowners employers.

---

6. The city apparently concedes that Shannon was a seaman injured in the course of his employment.

7. Act of Sept. 24, 1789, ch. 20 § 8, 1 Stat. 76. This statute, presently codified as 28 U.S.C. § 1333 (1948), now reads in part as follows:
   The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
   (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

8. G. Gilmore & C. Black, The Law of Admiralty 33–36 (1957).

9. *Id.* at 45–46; *see* Stevens, Erie R. R. v. Tompkins and The Uniform General

Maritime Law, 64 Harv.L.Rev. 246 (1950); Maxwell v. Olsen, 468 P.2d 48, 51 (Alaska 1970).

10. Gilmore & Black, *supra* n. 8, at 20.

11. 46 U.S.C. § 688 (1952). The railway's employee statutes referred to are 45 U.S.C. §§ 51–60 (1952), the Federal Employer's Liability Act, abolishing assumption of risk, replacing contributory with comparative negligence, and applying a three-year statute of limitation, among other things. Historical Note at 46 U.S.C. § 688 (1952); Gilmore & Black, *supra* at 296–301.

12. Gilmore & Black, *supra* n. 8, at 286–88.

13. *Id.* at 374–86.

We find no merit in appellant's position for it is well established that a Jones Act cause of action lies only against an employer by his employee.[14] Since this type of relationship did not exist between Shannon and the city, Shannon cannot maintain a Jones Act action against the city.

We next turn to the question of the applicability of admiralty law and to the city's contention that this is not a case in admiralty because Shannon's injury occurred on land rather than navigable waters. The answer to this issue is twofold. The comparatively recent Admiralty Jurisdiction Extension Act provides in part that:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.
>
> In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water * * *.[15]

■ The city of Anchorage concedes that under this statute the injury need not necessarily be caused by the vessel itself provided it results from the acts of the vessel's personnel or acts connected with the vessel's operation.[16] We think appellee's concession appropriate for under the facts of this record it is clear that jurisdiction is present under the Admiralty Jurisdiction Extension Act, which extends the admiralty jurisdiction to all cases of injury caused by vessels on navigable water "notwithstanding that such * * * injury be done or consummated on land."

■ Even prior to the enactment of the Admiralty Jurisdiction Extension Act, it was held in *The Admiral Peoples*,[17] the leading case on this question, that a fall from a ship's gangplank onto a dock comes within the admiralty jurisdiction. It has been clear since *The Admiral Peoples* that admiralty jurisdiction extends to a fall from a ship's ladder, regardless of whether the injury occurs on land or sea.[18] In the case at bar, it is undisputed that Shannon fell from a ladder belonging to the barge and extending from the barge to the dock, striking a camel log and sinking partly into the water.[19] In light of these facts, we conclude that Shannon's injuries took place in such a locality as to invoke admiralty jurisdiction.[20]

14. Raines v. John I. Hay Co., 194 F.Supp. 706 (N.D.Ill.1960). In Gilmore & Black, *supra* n. 8, at 285, the authors state:
   Since the Jones Act covers only course of employment injuries, it is reasonable to conclude that actions under it are maintainable only by seaman-employee against shipowner-employer. Against third party tortfeasors the seaman would have the ordinary remedies in tort, but would not be able to sue under the Jones Act. * * * [I]t is hard to construct a policy which would give seamen as a class special privileges as plaintiffs in tort actions which are not based on the employment relationship.

15. 46 U.S.C. § 740 (1948).

16. *See* Hovland v. Fearnley & Eger, 110 F.Supp. 657, 658 (E.D.Pa.1952).

17. 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935).

18. Tullis v. Fidelity & Cas. Co., 397 F.2d 22 (5th Cir. 1968); Schell v. Chesapeake & Ohio R. R. Co., 395 F.2d 676 (4th Cir. 1968); Vanderlinden v. Lorentzen, 139 F.2d 995 (2d Cir. 1944); Fan Shen Hang v. Prestlien, 88 F.2d 42 (9th Cir.), cert. denied, 301 U.S. 705, 57 S.Ct. 938, 81 L.Ed. 1359 (1937).

19. A camel is a wooden float, or a log, used as a fender to fend ships off piers or pilings.

20. Shannon also argues that the city undertook to carry out the barge owner's obligation of seaworthiness, so was liable for unseaworthiness jointly and severally with the barge owner. We hold that the doctrine of unseaworthiness has no applicability. Daniels v. Florida Power & Light Co., 317 F.2d 41, 43 (5th Cir.), cert. denied, 375 U.S. 832, 84 S.Ct. 78, 11 L.Ed.2d 63 (1963), involved seamen's claims against the ship's owner and the owner of a wharf arising out of a fall from the wharf's ladder to the ship. The seamen contended that the wharf owner was liable under unseaworthiness doctrine

This leads to the question of whether or not admiralty law doctrines should be applied to an action based on a claim of negligence. The leading case on this issue is Pope & Talbot, Inc. v. Hawn,[21] in which an employee of a ' ship repair company brought an action to recover for personal injuries against the owner of the ship where they occurred, alleging both unseaworthiness and negligence. The shipowner alleged contributory negligence as a defense to each claim. The court held that the negligence and the unseaworthiness claims were "rooted in federal maritime law," [22] so the state could not deprive the claimant of substantial admiralty rights. Therefore, the state rule that contributory negligence barred recovery had no application; the maritime rule that contributory negligence merely mitigated damages controlled.[23] *Hawn* was followed by Kermarec v. Compagnie Generale Transatlantique,[24] in which the Supreme Court held that contributory negligence only mitigates damages and does not 'bar recovery when a case falls within the maritime jurisdiction.[25] In light of these authorities, we hold that in the case at bar it was error for the trial court to have given the jury instructions pertaining to the defense of contributory negligence. On the other hand, we are of the further view that the trial court's instructions concerning the subject of contributory negligence constituted harmless error in light of the evidence which was adduced concerning the city's alleged custom of furnishing Jacob's ladders.[26]

According to the testimony, Cook Inlet's tides and currents were reputed to be the "most severe" in the world with maximum tides of 40 feet and eddying 5 to 8 knot currents in the area of the city dock. On April 7, 1963, the day of Shannon's fall, high tide occurred at 5:42 p. m. at which time the tide was 28.9 feet above mean sea level. Low tide occurred at 11:59 p. m. at 1.1 foot above datum plain. Sometime between 9:30 and 10 p. m., the captain of the ROUGHNECK became concerned over drifting ice conditions and decided more lines were needed to secure the barge and the tug to the city dock. Shannon's fall from the barge's wooden ladder happened shortly after 10 p. m.

As to his use of the barge's straight 18-foot wooden ladder in order to gain access to the city's dock on the evening in question, Shannon testified as follows:

Q Now isn't it also true, Mr. Shannon, that normally the Jacob's ladders or the use of the Jacob's ladder that you've referred to are used by you

for making the vessel unseaworthy by supplying an inadequate ladder. Thus, the case is on all fours with the case at bar. The court held that seaworthiness doctrine did not apply, because

[t]he idea of seaworthiness and the doctrine of implied warranty of seaworthiness arises out of the vessel, and the critical consideration in applying the doctrine is that the person sought to be held legally liable must be in the relationship of an owner or operator of a vessel.

21. 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

22. *Id.* at 409, 74 S.Ct. 202, 98 L.Ed. at 151.

23. *Id.* at 409, 74 S.Ct. 202, 98 L.Ed. at 150.

24. 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).

25. In Maxwell v. Olsen, 468 P.2d 48, 50 (Alaska 1970) (footnote omitted), we said that:

A state court under the 'saving to suitors' clause of the Judicial Act of 1789, * * * must apply the doctrine of comparative, rather than contributory negligence.

26. The jury was told that the city had "set up the defense of contributory negligence, and that the * * * [city] is entitled to a verdict if * * * [it] proves such defense * * *." In a subsequent instruction in which the issues were outlined to the jury, it was stated in part that if they found that Shannon was contributorily negligent and such contributory negligence proximately caused his injuries then their verdict must be for the city.

normally only in the docking process. * * *

A We use them in all stages of the tide for any purposes. * * *

Q I see.

A * * * as long as we couldn't reach the dock otherwise.

Q All right. But tell me this, didn't you normally use the Jacob's ladders primarily in the docking process. In other words, when you came in and you wanted to get lined up there, that's mainly when you used the Jacob's ladders right?

A Yes.

Q And once you did get docked or once you did get berthed at the dock, the normal method that you used to get on and off the boat was the ladder from the boat, isn't that true?

A Depending on the stage of the tide.[27]

Q But isn't it true that normally you would use the ladder getting on or off the boat after you had already tied up or been docked?

A If the tide was high enough we would.

Q Well at the time of this accident, you were not in the docking process, right?

A No, sir.

Q You had already docked and you were already secured, right?

A Yes, sir.

Q And so normally under these conditions you would use a wooden ladder the same as you actually were doing at the time of the accident, isn't that true?

A If the tide is high enough and the ladder reaches, yes, sir.

Q Well, in this case didn't the ladder reach the top of the dock?

A Yes, sir.

Q In this case didn't you believe you could climb the ladder without any problem?

A I did.

Q And in fact you did use the ladder, didn't you?

A Yes.

Q And in fact the accident occurred?

A Right, yes.

Q So apparently at the time of the accident you felt that you had a reasonable means of access to the top of the dock, isn't that true?

A Yes.

■ Shannon's testimony as to the customary use by the crew of the ROUGHNECK of its own ladders, as long as the tides allowed the crew to reach the dock with these ladders, was reiterated by several witnesses and in its essential features remained uncontradicted.[28] Thus, even if

27. The record shows that the ROUGHNECK and its barge docked at the city facility at approximately 7 p. m. at which time the tide still remained at a relatively high level. After docking, Foss Launch and Tug Company's Anchorage port captain and his wife came aboard the ROUGHNECK by use of the same ladder that Shannon attempted to use later in the evening. Just prior to the accident, two members of the ROUGHNECK crew went ashore gaining access to the dock by the use of this same ladder.

28. Edwin Stultz, a crew member, testified that they would use the boat's ladders to gain access to the top of the dock if Jacob's ladders were unavailable and if the tide was high enough. Donald Waggoner, port captain for Foss, testified that if Jacob's ladders were not available and if the tide was not out too far they used their own ladders for access. Captain Rosenquist of the ALASKA ROUGHNECK testified that Jacob's ladders were rarely used and that wooden

Shannon had shown by a preponderance of the evidence a custom on the city's part of furnishing Jacob's ladders to provide access to its dock, we believe the jury had before it strong evidence which negated the possibility of their finding any element of reliance upon such custom either by Shannon or fellow crew members similarly situated during comparable tidal conditions. Considering this highly persuasive evidence of the customary practices of the crew of the ROUGHNECK, we conclude that the jury possessed ample evidence for reaching a verdict of no liability in favor of the city.[29] In other words, assuming that Shannon had proven the existence of a customary furnishing of Jacob's ladders on the part of the city, his own evidence precluded the possibility of the jury's deciding that the city's discontinuance of such custom was, on the evening in question, a proximate cause of the accident in question.

We are also of the opinion that the record discloses a strong rational evidentiary basis for the jury's determination that no custom of furnishing Jacob's ladders on the city's part was established.

In light of our foregoing conclusions as to the evidence relating to the issues of custom, duty, and proximate cause, we hold the trial court's contributory negligence instructions did not prejudice any substantial rights of appellant and were therefore harmless error.[30]

Affirmed.

ladders were used "for going to and from barges" onto the dock.

29. Under Shannon v. City of Anchorage, 429 P.2d 17 (Alaska 1967), the trial court's instructions going to the issue of custom were not erroneous. Appellant argues that the court's instructions and related interrogatories concerning custom were too restrictive. In part, the court's instructions required the jury to find that the city had established a "custom of providing Jacob's ladders as a means of access to the top of the Port of Anchorage dock, at all hours of the day, at all stages of the tide, and under any weather conditions prevailing at the time and under circumstances substan-

tially similar to those involved in this case."

We do not believe these instructions or interrogatories were too restrictive or misleading in light of the pertinent portions of the record. There was no question that the dock was closed during the winter seasons. According to Shannon's own testimony, the Jacob's ladders were removed during the winter months. Shannon further testified that the Jacob's ladders hung over the face of the dock and were available 24 hours a day throughout the previous year that he worked in and out of this same dock.

30. Civ.R. 61. Our holding has made unnecessary decision of any other issues in this appeal.