Anna L. BASEL, A Citizen of Oregon, Personal Representative of the Estate of Ray Basel, Bernard Heaney, A Citizen of New York, Personal Representative of the Estate of Shawn Heaney; Olafia Johnsdottir, A Citizen of Iceland, Personal Representative for the Estate of Sveinn Ben Adalsteinsson; and Linda Perri, A Washington Citizen, Personal Representative of the Estate of Paul Rowe, Appellants,

v.

WESTWARD TRAWLERS, INC., Steuart Investment Co., Steuart Fisheries, Inc., Don Hanson, F/V Half Moon Bay, Rick Johnson, F/V Sunset Bay, Taiyo Fisheries Company, Western Alaska Fisheries, Inc., Viking Limited Partnership, Horizon Trawlers Inc., Robert Dooley, Hugh Riley, John A. Dooley, Sea Pacific, Inc., Appellees.

No. S–4708.

Supreme Court of Alaska.

March 4, 1994.

---

Gerald W. Markham, Kodiak, for appellants.

John A. Treptow, Atkinson, Conway & Gagnon, Anchorage, for appellees Westward Trawlers, Inc., Steuart Inv. Co., Steuart Fisheries, Inc., Don Hanson, F/V Half Moon Bay, Rick Johnson, F/V Sunset Bay.

Herbert H. Ray, Jr., Bliss Riordan, Anchorage, for appellees Taiyo Fisheries Co., Western Alaska Fisheries, Inc., Viking Ltd. Partnership, Horizon Trawlers, Inc., Robert Dooley, Hugh Riley, John A. Dooley, Sea Pacific, Inc.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

### OPINION

RABINOWITZ, Justice.

The F/V *Alert*, owned and captained by Melvin Wick, disappeared in the Shelikof Straits near Kodiak Island in February 1985. This appeal arises from wrongful death claims that Anna L. Basel and others (collectively Basel), in their capacities as personal representatives of four deceased crew members of the F/V *Alert*, asserted against the participants in a Magnuson Act joint fishing venture.[1]

## I.  *FACTS AND PROCEEDINGS*

Melvin and Shari Wick were the owners of the F/V *Alert*, and Melvin Wick was the vessel's master, when it disappeared in February 1985. The Wicks and the other owners of the catcher vessels appointed Westward as their agent in dealing with Taiyo. Under its agreements to participate with the Wicks and the owners of the other catcher vessels, Westward was to coordinate joint fishing operations and to act as a representative for the owners "in all dealings between the Fishing Vessels and Taiyo." As payment for its services, Westward was to receive "two and one-half percent (2½%) of the gross value of all consideration due Owner for deliveries of fish by Owner's Vessel to the Processing Vessels."

Taiyo and Westward entered into a "Fishing Agreement—Alaska Pollack Fishing" in May of 1983.[2] Under the terms of this agreement Taiyo was obligated to purchase Alaska pollack and other bottom fish and was further obligated to provide two processing vessels. Westward was to coordinate fishing operations, to arrange for seven American-owned catcher vessels to catch the pollack

---

1. The principal appellees in this case are (1) Taiyo Fishery Co., Ltd. (Taiyo), a Japanese fish processing firm whose processing ships participated in the Magnuson Act 1985 fishery; (2) Western Alaska Fisheries, Taiyo's wholly-owned subsidiary, which undertook certain services to Taiyo and possibly others in regard to the fishery; (3) Westward Trawlers (Westward), which functioned as a coordinator between the Taiyo processing vessels and the catcher vessels who had contracted with Westward to supply fish for sale to the processing vessel, and which determined where the vessels would fish and when they would deliver fish to Taiyo; and (4) Steuart Investment Co. and Steuart Fisheries, Inc. (Steuart), owners of the F/V *Half Moon Bay* and F/V *Sunset Bay*, and their skippers, Don Hanson and Rick Johnson.

Steuart owned 50% of Westward and held two of three seats on Westward's board of directors. Westward in turn held part ownership interests in the Steuart vessels. Basel refers to the mutual interests of these two enterprises as Westward/Steuart.

2. In 1983 Taiyo applied to the Department of Commerce to obtain foreign fishing vessel permits for two of its processing vessels to fish the "Bering Sea and Aleutian Islands Groundfish" as well as the "Gulf of Alaska." These permits were sought as part of a Magnuson Act joint venture in support of U.S. vessels. Taiyo's application was granted by the Department.

and other bottom fish, and to supply the fish to the two Taiyo processing vessels.

Westward subsequently contacted Melvin Wick, who eventually agreed to participate in the 1983 fishery. Westward and Wick entered into an "Agreement to Participate in Joint Venture and to Appoint Agent." Under this agreement Wick was to provide a fully licensed and equipped F/V *Alert,* ready for fishing, and a crew. Westward entered into similar separate agreements with other catcher vessel owners.

In 1983 Taiyo, Westward, the F/V *Alert* and six other American-owned catcher vessels engaged in a Magnuson Act joint venture fishing operation.[3] Subsequently, Westward and Taiyo entered into a "Memorandum of Agreement for the 1985 Joint Venture Pollack Fisheries." This agreement incorporated the terms and conditions of the 1983 fishing agreement. Additionally, it established new tonnage limits and prices to be paid by Taiyo for the fish delivered by the catcher vessels during the 1985 fishery.

In 1985, the catcher vessels entered into an oral agreement to share or "pool" certain receipts. In the event that a catcher vessel's delivery of fish reached or exceeded an agreed upon fifty metric ton limit, the extra revenue for the additional fish "would go into a pool that would be shared amongst the catcher vessels." This pooling agreement did not affect the price per pound that Taiyo paid for the fish purchased from the catcher vessels, since this price was the same whether or not a delivery exceeded fifty metric tons. Similarly, Westward's 2.5% compensation remained fixed whether or not a delivery exceeded fifty metric tons.

After the disappearance of the F/V *Alert,* the personal representatives of four fishers who died on the vessel filed claims in a limitation proceeding initiated by Shari Wick pursuant to 46 U.S.C.App. § 183. These claims were eventually settled for approximately $1,810,000.00.[4] After the settlement, Basel filed a complaint in the superior court against the 1985 Shelikof Fishery Joint Venture for wrongful death, pre-death pain and suffering, negligence, and unseaworthiness.

In the superior court action Basel asserted that Westward/Steuart and Taiyo formed a common law joint venture with the Wicks and that this joint venture was the Jones Act employer of the decedents at the time of their deaths.[5] In the event the joint venture

3. The Magnuson Act gives U.S. companies priority access to fishery resources located within a 200–mile zone in waters contiguous to the territorial sea of the United States; it allows foreign fishing only if an international fishing treaty permitting such activity existed at the time of the Act. 16 U.S.C. § 1821(b), (d); *see also United States v. Seafoam II,* 528 F.Supp. 1133, 1135 (D.Alaska 1982); *see generally* H. Gary Knight, *Managing the Sea's Living Resources* 83–85 (1977) (summarizing Magnuson Act) Warren G. Magnuson, *The Fishery Conservation and Management Act of 1976: The First Step Towards Improved Management of Marine Fisheries,* 52 Wash.L.Rev. 427 (1977) (discussing substance of act, legislative history relating to it, and act's impact on U.S. foreign policy). As originally passed in 1976, it allowed foreign fisheries to sidestep some of the effects of the act by creating "joint business ventures." *See* Chris Blackburn, *Alaskans Unwilling to Join Joint Venture,* Kodiak Daily Mirror, July 13, 1978, at A1; *Fear Partnership Is a Ploy,* Kodiak Daily Mirror, Sept. 14, 1976, at A1. Foreign processor partnerships did not have to be licensed under the 1976 Magnuson Act because they were not "fishing." The proliferation of "joint ventures" combined with an inability to regulate the field resulted in the 1978 Processor Priority Amendment. Pub.L. No.

95–354, 92 Stat. 519 (1978). The Department of Commerce through its administering agency, the National Oceanic and Atmospheric Administration, promulgated regulations that defined a joint venture as

> any operation by a foreign vessel assisting fishing by U.S. fishing vessels, including catching, scouting, processing and/or support. (A joint venture generally entails a foreign vessel processing fish received from U.S. fishing vessels and conducting associated support activities.) 50 C.F.R. § 611.2 (1992).

4. The *Alert* was officially registered in the name of Melvin and Shari Wick. Shari Wick commenced a limitation action on behalf of herself personally and as personal representative of the Melvin Wick estate. The action proceeded in federal court in a case captioned *In Re: Complaint of Shari Wick,* A85–639 Civil, and was settled without adjudication of the merits of any substantive issues. Though the settlement foreclosed future claims against the Wicks, it expressly allowed Basel to sue any other persons or entities allegedly liable for the accident.

5. Under the Jones Act, "[a]ny seaman who shall suffer personal injury in the course of his employment may ... maintain an action for dam-

was not found to be the Jones Act employer, Basel alternatively alleged that the joint venture was vicariously liable under the Jones Act for the negligence of the joint venturer skipper, Melvin Wick.

Westward, Steuart, and the masters of the F/V *Sunset Bay* and the F/V *Half Moon Bay* moved for summary judgment, alleging that (1) no joint venture existed, because there was no evidence of the essential elements of profit and loss sharing and the right of joint control of the adventure; and (2) Melvin Wick was the owner and operator of the F/V *Alert* and the decedents' sole Jones Act employer. Taiyo and Westward also filed a motion for partial summary judgment, asserting that they were not Jones Act employers and were not liable for the unseaworthiness claim because they were neither owners of the F/V *Alert* nor joint venturers with Wick.

Basel opposed the motions for summary judgment and cross-moved for summary judgment, requesting a determination that as a matter of law a joint venture existed among all the parties, and that the joint venture was the equitable owner of the F/V *Alert* and thus owed the *Alert*'s crew a duty of seaworthiness. The superior court initially denied the summary judgment motions and cross-motion, concluding that genuine issues of material fact existed regarding whether there was a common law joint venture, who had equitable ownership of the F/V *Alert*, what the effect of the duty of seaworthiness was, and whether the joint venture was Wick's superior employer and thus liable to the de-

cedent seamen. Taiyo and Westward subsequently moved for reconsideration on the ground that there had been no sharing of profits, an essential element of a joint venture under federal maritime law, Alaska law, and Washington law.

The superior court granted Taiyo's motion for reconsideration and modified its prior decision, granting Taiyo summary judgment. The superior court reasoned that Basel offered no evidence of an "agreement to share profits and losses," that evidence in support of Basel's theory of joint venture by estoppel was insufficient to raise a genuine issue of material fact, and that use of the term "joint venture" in the parties' agreements does not necessarily mandate the conclusion that Taiyo or Westward/Steuart was Basel's Jones Act employer.[6] This appeal followed.

## II. JURISDICTION

[T]he admiralty jurisdiction of the United States extends to all waters, salt or fresh, with or without tides, natural or artificial, which are in fact navigable in interstate or foreign water commerce, whether or not the particular body of water is wholly within a state, and whether or not the occurrence or transaction that is the subject-matter of the suit is confined to one state.

Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 31–32 (2d ed. 1975). State courts may adjudicate claims in admiralty under the "saving to suitors" clause of 28 U.S.C. § 1333.[7] *Shannon v. City of Anchorage*, 478 P.2d 815, 818 & n. 7 (Alaska 1970).

---

ages at law ... and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law." 46 U.S.C.App. § 688.

**6.** Westward/Steuart moved for summary judgment, arguing that they were not participants in a joint venture because they did not share profits. The superior court granted Westward/Steuart partial summary judgment, stating that there was insufficient evidence to support Basel's theory of joint venture by estoppel. The superior court scheduled oral argument on the issue of whether Westward/Steuart was part of a joint venture. The court subsequently issued an oral order granting Westward/Steuart summary judgment on the joint venture issue. The court ruled that

Westward/Steuart did not share profits, therefore as a matter of law there was no joint venture.

The superior court denied Basel's motion for reconsideration of its grant of partial summary judgment. Thereafter the parties filed a stipulation agreeing to dismiss with prejudice all remaining claims against Shelikof Fisheries so that Basel could immediately appeal from the summary judgment orders.

**7.** This statute provides in relevant part:

The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

In *Shannon* we said that "seamen may bring saving to suitors clause suits under the Jones Act in state courts. Apparently maritime rules of substantive law, as modified by the Jones Act, apply in saving clause cases in state courts under the Jones Act." *Id.* at 818 (footnote omitted).

## III. *ARGUMENTS*

The parties do not contest that the F/V *Alert* disappeared in the 200 mile contiguous zone in the Shelikof Strait in waters between Kodiak Island and the Alaskan Peninsula. We therefore initially look to federal maritime law to determine whether the superior court correctly ruled that no genuine issues of material fact were presented relating to the existence of a joint venture between Taiyo, Westward/Steuart, and the owners of the F/V *Alert,* and whether the superior court correctly held that as a matter of law Basel had failed to prove the existence of a joint venture between Taiyo, Westward/Steuart and the owners of the F/V *Alert.*

### A. *Applicable Law*

The Jones Act does not contain a definition of "joint venture." The superior court, in holding that the showing of profits and losses is an essential element of a joint venture, did not specify what law it was applying.

Basel argues that paramount maritime law does not require a showing of profits and losses for the establishment of a joint venture. She relies on two lines of federal authority, namely *Davidson v. Enstar Corp.,*

848 F.2d 574 (5th Cir.), *superseded,* 860 F.2d 167 (5th Cir.1988) (joint venture in the context of litigation under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901), and *Fulcher's Point Pride Seafood, Inc. v. M/V "Theodora Maria",* 935 F.2d 208 (11th Cir.1991) (litigation involving joint ventures and maritime liens under the Maritime Lien Act, 46 U.S.C. § 31342).[8]

■ State law applies in admiralty cases in the absence of either a controlling federal statute or a rule established by the federal courts. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313–14, 75 S.Ct. 368, 370, 99 L.Ed. 337 (1955). Taiyo and Westward/Steuart contend that no maritime law defining joint venture exists. More particularly, they note that maritime courts apply the relevant state's law regarding joint venture in determining whether a joint venture exists.[9]

■ Review of the relevant authorities persuades us that no paramount or general federal maritime law defines joint venture in the context of Jones Act litigation.[10] Further, we are not persuaded that there is a special need for uniformity regarding the defining elements of a joint venture.[11] We thus turn to Alaska law.

### B. *Alaska Law of Joint Venture*

■ Taiyo and Westward/Steuart take the position that Alaska law establishes that the right to share profits and losses is an essential element of a joint venture. They are

28 U.S.C. § 1333.

**8.** *See also Sasportes v. M/V Sol de Copacabana,* 581 F.2d 1204, 1208 (5th Cir.1978).

**9.** *See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* No. 86 CIV. 1313 (RLC), 1988 WL 75262, at *3, 5 (S.D.N.Y. July 13, 1988), *aff'd in part, vacated in part on other grounds,* 909 F.2d 698, 701 (2d Cir.1990); *see also Lyon v. Ranger III,* 858 F.2d 22, 27 (1st Cir.1988) (applying Massachusetts law); *Rowe v. Brooks,* 329 F.2d 35, 40–41 (4th Cir.1964) (applying Virginia law); *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, Process Supply Co., Inc.,* 611 F.Supp. 665, 679 (D.N.J.1985).

**10.** In reaching this conclusion we reject Basel's contention that the *Davidson* and *Fulcher's Point* lines of federal authority establish paramount federal maritime law to the effect that the show-

ing of profits and losses and the right to joint control are merely important indicators of a joint venture relationship rather than essential elements of such a relationship.

*Fulcher's Point* deals with maritime liens, not with employment status or tort liability under The Jones Act. 935 F.2d at 209. The emphasis of *Fulcher* was on nondilution of the credit of the vessel and the maintenance of this security for suppliers who are strangers to ownership of the vessel. *See id.* at 211, 213. *Davidson* involved the application of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901. 848 F.2d at 575.

**11.** *But cf. Evich v. Morris,* 819 F.2d 256, 257–58 (9th Cir.), *cert. denied,* 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987) (holding that uniformity is as important in maritime survival actions as it is in maritime wrongful death actions).

correct. Alaska has approved Professor Williston's formulation of the requirements of a joint venture. *Nicholas v. Moore,* 570 P.2d 174, 178 (Alaska 1977). According to Williston the requirements are

(a) A contribution by the parties of money, property, effort, knowledge, skill, or other asset to a common undertaking;

(b) A joint property interest in the subject matter of the venture;

(c) A right of mutual control or management of the enterprise;

(d) Expectation of profit, or the presence of "adventure," as it is sometimes called;

(e) A right to participate in the profits;

(f) Most usually, limitation of the objective to a single undertaking or ad hoc enterprise.

2 Samuel Williston, *Williston on Contracts* § 318A, at 563–65 (Walter H.E. Jaeger ed., 3d ed. 1959) (footnotes omitted); *see also Fomby v. Whisenhunt,* 680 P.2d 787, 790 (Alaska 1984); *Alaska State Hous. Auth. v. Blomfield, Dudley & Ekness,* 662 P.2d 114, 117 (Alaska 1983); *Northern Lights Motel, Inc. v. Sweaney,* 561 P.2d 1176, 1187 (Alaska 1977). Our decisions also require a sharing of the profits for the establishment of a joint venture.[12]

### C. A Joint Venture Was Not Established as to Taiyo

▪ We affirm the superior court's ruling that Basel failed to establish the existence of a joint venture between Taiyo, Westward/Steuart, and the F/V *Alert.* Under the operative agreements between the parties, Taiyo's role was to purchase and then process fish purchased from the catcher boats. These agreements fixed the prices that Taiyo was to pay the catcher boats. Taiyo's obligation to pay these agreed-upon prices to the catcher boats remained fixed regardless of whether or not it made any profits from the fish it processed. Taiyo profited only in the larger sense of the word—that is, if it made a profit from the fish it purchased and processed. There is no evidence in the record

that Taiyo agreed to share profits or losses with its alleged joint venturers.

Taiyo's agreement to lend its resources and expertise to assist catcher boats in the search for and retrieval of lost cod ends does not establish that it was engaged in a joint venture with the catcher boats, nor does the fact that the relationship with Westward/Steuart was described as a joint venture. As noted above, the joint venture terminology results from the provisions of the Magnuson Act and the text of 50 C.F.R. § 611.2, which contains an extremely broad definition of joint venture.

### D. A Joint Venture Was Not Established as to Westward/Steuart

▪ Under the controlling agreement, Westward/Steuart was to receive a fixed percentage (2.5%) of the gross receipts paid by Taiyo to the catcher boats for fish sold to Taiyo. Westward/Steuart was to receive its 2.5% of the gross receipts whether or not any of the catcher boats made a profit on their sales to Taiyo. Westward/Steuart also received 2.5% of the gross sales receipts from any hauls of at least fifty metric tons of fish.

There is no evidence in the record that Westward/Steuart agreed to share the profits or losses with other alleged joint venturers. Westward/Steuart's compensation was based solely on a percentage of the catcher vessels' gross receipts, not any share in any profits as that term is normally understood. Just as "the sharing of gross returns does not of itself establish a partnership," AS 32.05.020(3), the sharing of gross receipts between Westward/Steuart and the catcher boats does not establish the existence of a joint venture. Therefore, we affirm the superior court's ruling that Basel did not establish the existence of a joint venture between Westward/Steuart, Taiyo and the F/V *Alert.*

### E. A Joint Venture Was Not Established as to Taiyo Since It Had No Right of Mutual Control of Management of the Alleged Adventure

▪ Basel argues that the relevant documents demonstrate that Taiyo, West-

---

**12.** As Taiyo points out, a substantial majority of jurisdictions consider the right of the parties to share in the profits to be an essential element for the existence of a joint venture. *See, e.g., Karl's,*

*Inc. v. Sunrise Computers, Inc.,* 901 F.2d 657, 659 (8th Cir.1990) (applying and construing Oregon law); *Nelson v. Serwold,* 687 F.2d 278, 282–83 (9th Cir.1982) (construing Washington law).

ward/Steuart and the catcher vessels agreed to a detailed plan for the coordination of the combined efforts of the two processing vessels and the catcher vessels. Pursuant to those agreements, the parties delegated a significant degree of control to Westward, who was to act as the parties' coordinator.

Basel contends that these agreements deprived the skippers of their freedom to depart from an assigned location in the face of danger:

> [T]he ALERT's master did not have the authority to unilaterally act for the paramount protection of his vessel and its crew.... Only when conditions deteriorated to the point of "extreme emergency" which "*seriously*" threatened the safety of the vessel or the crew, could the vessel owner arguably unilaterally leave, and only then at the risk of being assessed damages if his judgment of the situation was subsequently determined to be precipitous.

In *Nicholas* we discussed the requirement that joint venturers have the right of mutual control over all aspects of the management of the enterprises. 570 P.2d at 178. Taiyo's control over the F/V *Alert* was insufficient to establish a joint venture or to impose vicarious liability upon it for Melvin Wick's alleged negligence. There is no evidence that Taiyo had the right to control Wick's performance as master of the F/V *Alert*. Taiyo did not exercise any control over the management of the F/V *Alert* in the outfitting, equipping, and hiring or firing of the crew. Nor did Taiyo exercise any significant degree of control over the details of the navigation of the F/V *Alert*.

### F. A Joint Venture Was Not Established as to Westward/Steuart Since it Had No Right of Mutual Control or Management of the Alleged Joint Venture

Study of the record persuades us that Westward is correct in its assertion that

there is no evidence in the record establishing that Westward had a right of mutual control over the navigation of the catcher vessels. The fact that the parties' agreement provided for the coordination of catcher deliveries to the processing ships, a detailed manual calling for certain procedures, and control over the transfer of fish from a floating net does not establish that Westward had control over the navigation of the F/V *Alert* when it disappeared in February 1985. Rather, the sole authority and responsibility for the navigation of the F/V *Alert* remained with the master of the vessel.[13]

### G. The Superior Court Correctly Entered Summary Judgment Against Basel on Her Joint Venture by Estoppel Claim

■ Basel additionally argues that the superior court erred in granting summary judgment against her on her joint venture by estoppel claim. The essence of Basel's argument is that Taiyo and Westward/Steuart employed joint venture language in the agreements, and that this defined the relationship of the parties. Given the parties' use of joint venture terminology, Basel further contends that if Taiyo and Westward/Steuart wished to avoid joint venture liability "in the face of these agreements, at the very least they should have expressly so declared."

Taiyo and Westward/Steuart counter that the superior court granted summary judgment on this issue on the ground that Basel had failed to show that the crew of the F/V *Alert* relied on the existence of a common law joint venture. Taiyo and Westward/Steuart also contend the superior court could have granted summary judgment in their favor on

---

**13.** Westward correctly argues that the uncontroverted evidence in the case establishes that

1) the individual vessel masters decided where their vessels would fish, how long they would fish, and what gear they would use; 2) on February 13, 1985, it was the catcher vessel masters who decided to stop fishing because of deteriorating weather conditions; 3) Captain Wick was not required to advise Westward of his departure from the fishing grounds and did

not need Westward's permission to do so; 4) it was Wick's unilateral decision to take his vessel to the Alaska Peninsula side of Shelikof Straits; 5) it was Captain Wick's unilateral decision to turn his vessel around and head east back toward Kodiak Island when his vessel began icing up; 6) navigation of any vessel in the Shelikof fishery was the responsibility of the captain.
(Footnote omitted).

the estoppel issue on the basis that neither misrepresented that they were joint venturers.

Taiyo and Westward/Steuart draw a valid distinction between a Magnuson Act joint venture and a common law joint venture. The only evidence Basel relies on in support of her position is the 1985 Taiyo–Westward fishing agreement. Though this agreement constituted an agreement to participate in a Magnuson Act fishery joint venture,[14] Basel adduced no evidence that either Taiyo or Westward/Steuart misrepresented that they were engaged in a common law joint venture.

Further, review of the record fails to reveal any evidence that the crew of the F/V *Alert* relied on a representation by either Taiyo or Westward/Steuart that they had entered into a common law joint venture with Melvin Wick. Nor is there any evidence that the crew of the F/V *Alert* believed that they were employed by a joint venture consisting of Taiyo and Westward/Steuart.[15]

## IV. CONCLUSION

The superior court's grant of summary judgments in favor of Taiyo and Westward/Steuart are AFFIRMED.

**14.** On this point Taiyo further elaborates:
Pursuant to the agreement, Taiyo, a foreign corporation was to purchase fish from U.S. vessels within the FCZ. Taiyo had to obtain a joint venture permit from NOAA to participate in the fishery. The agreement was expressly conditioned on Taiyo's ability to obtain those permits. It is undisputed that Taiyo *did* obtain NOAA permits to participate in a Magnuson Act joint venture fishery and was purchasing fish from Wick pursuant to those permits.

**15.** Not until her reply brief does Basel develop in any significant respect her contention that the

owners of the other catcher vessels were joint venturers with the owners of the F/V *Alert*. Basel's theory is based on the fact that the owners of the catcher vessels agreed to pool proceeds derived from tows exceeding 50 metric tons in order to compensate catcher vessels that went off to scout new areas to fish while the other vessels remained fishing in an area.

We reject this argument. Sharing in proceeds is not the equivalent of a sharing in the profits and losses for purposes of establishing joint venture status.