[No. G045886, G046287. Fourth Dist., Div. Three, Feb. 13, 2013.]

SARA MICHELLE SIMMONS, as Special Administrator, etc., Plaintiff and Respondent, v.
CHAD WARE, Defendant and Appellant.

1036

## Counsel

Harrington, Foxx, Dubrow & Canter, Daniel E. Kenney and John D. Tullis for Defendant and Appellant.

McGuinn, Hillsman & Palefsky and John R. Hillsman for Plaintiff and Respondent.

## Opinion

**O'LEARY, P. J.**—Chad Ware appeals from the judgment entered against him in this maritime wrongful death action. Ware owned a vessel that was being used for a live onboard marine education program for students. The decedent, an adult chaperone on the trip, drowned while "free-diving" during a daytime excursion off of the ship conducted by the operators of the educational program. The jury returned a special verdict finding the company that operated the marine education program was a negligent cause of decedent's death (apportioning 20 percent of the fault to it), and finding the decedent was also negligent (apportioning 80 percent of the fault to him), but finding no negligence on the part of Ware. The trial court subsequently granted

plaintiff's motion for judgment notwithstanding the verdict (JNOV), and entered judgment against Ware finding the uncontroverted evidence demonstrated that as a matter of law Ware and the operator of the trip were in a joint venture making Ware vicariously liable for the operator's negligence.

We conclude the trial court erred. The existence of a joint venture was not alleged in plaintiff's complaint, it was not an issue litigated at trial, the jury was not instructed on joint venture liability, and the special verdict form asked no questions concerning the existence of a joint venture. Moreover, the trial evidence did not establish that as a matter of law Ware and the trip operator were in a joint venture. Accordingly we reverse the judgment against Ware and we reverse the postjudgment order awarding plaintiff costs pursuant to Code of Civil Procedure section 998.

## FACTS AND PROCEDURE

*The Business Relationship*

Scott McClung was the owner and operator of Rapture Marine Expeditions (RME), an entity he founded in the mid-1990's to conduct educational marine biology trips for students. To support their son's endeavors, McClung's parents, Eugene and Mozelle McClung, commissioned the building of the 143-foot *Rapture*, a ship specifically designed to suit RME's needs. The *Rapture* was launched in 1998 and registered in the name of Certified Marine Expeditions (CME), a company owned by the Eugene and Mozelle McClung Family Trust (the McClung Family Trust). CME chartered the *Rapture* exclusively to RME, and RME had a reputation as a top operator of marine education programs for students, operating programs in the Hawaiian Islands in the winter, and in the California Channel Islands during spring and fall.

When McClung's father passed away in 2006, the McClung Family Trust withdrew the family's support for McClung's business, cancelled RME's charter agreement, and placed the *Rapture* up for sale. At the time, RME had already booked several Hawaii trips aboard the *Rapture* for the winter of 2007 and had received approximately $84,820 in deposits for those trips. It had booked various Channel Islands trips as well. Without the *Rapture*, many of those trips would have to be cancelled. McClung began looking for a way to salvage RME.

Ware, whose family was in the charter vessel business, had known McClung for many years, and the two families were "friendly" competitors. Ware was also involved in the marine educational program charter business, founding Adventure Cruise Lines (Adventure Cruise), which owned the

130-foot *Pacific Monarch* that Ware chartered out for educational trips. But Ware admitted Adventure Cruise did not have RME's reputation or its amount of business.

When CME cancelled RME's charter for the *Rapture*, Ware began chartering the *Pacific Monarch* to RME in November 2006 for its Channel Islands trips. Ware believed that if RME was to go out of business, it would have negative repercussions throughout the marine educational charter community, and could negatively impact his own company. Ware began negotiating with CME, hoping to throw McClung a "lifeline" to save RME's access to the *Rapture* by acquiring the *Rapture* and chartering it back to RME. Ware hoped that in so doing he would have a very long business relationship with RME and McClung in which he would be able to charter both his current ship, the *Pacific Monarch*, and the *Rapture* to RME for its trips. Ware chartered his vessels to other companies as well.

In January 2007, Ware and CME entered into a bareboat (also known as demise) charter/purchase agreement (the CME Purchase Agreement), pursuant to which Ware took control of the *Rapture* as de facto owner.[1] The CME Purchase Agreement provided Ware would bareboat charter the *Rapture* for five years and required him to make the monthly $22,269 payment on the *Rapture*'s mortgage and to bear all costs of the vessel's operation, maintenance, repair, insurance, and taxes during that time. At the end of the five years, Ware would purchase the vessel by paying off the mortgage. In addition, the CME Purchase Agreement required Ware to "be[] responsible

---

[1] "A 'charter' is an arrangement whereby one person (the 'charterer') becomes entitled to the use of the whole of a vessel belonging to another (the 'owner'). There are essentially two types of charters: the voyage or time charter and the bareboat or demise charter. [¶] In a time charter the vessel owner retains possession and control of the vessel; provides whatever crew is needed and is responsible for normal operating expenses. Further, in a time charter the owner fully equips and maintains the vessel, makes repairs as needed and provides insurance on the vessel. [¶] Generally the charterer's use of the vessel is limited under a voyage charter to a particular voyage between two defined points and under a time charter to a defined period of time. . . . The charterer pays a stated fee for the transportation services involved. [¶] Under a bareboat or demise charter, on the other hand, the full possession and control of the vessel is transferred to the charterer. The stated consideration for a demise charter is payable periodically but without regard to whether the charterer uses the vessel gainfully or not. Under a bareboat or demise charter the vessel is transferred without crew, provisions, fuel or supplies, i.e. 'bareboat'; and when, and if, the charterer operates the vessel he must supply also such essential operating expenses. Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability. [¶] . . . '[A] . . . demise charter requires complete transfer of possession, command, and navigation of the vessel from the owner to the charterer.' [Citation.] . . . '[A] demise is tantamount to, though just short of, an outright transfer of ownership.' [Citation.]" (*Walker v. Braus* (5th Cir. 1993) 995 F.2d 77, 80–81 (*Walker*).)

for and indemnify[] and hold[] CME . . . harmless" for the $84,820 in deposits already received by RME for the *Rapture*'s upcoming Hawaii trips.

Ware agreed to charter the *Rapture* to RME for a flat rate of $5,000 a day so RME could fulfill its outstanding Hawaii cruise obligations. There apparently was no written charter agreement between Ware and RME. The evidence adduced at trial was that RME was to provide its own crew and supplies for the trips. Ware was required to maintain and fuel the vessel at his own expense and provide a ship's engineer to perform any needed maintenance.

On January 26, 2007, two days after Ware acquired the *Rapture* from CME, the vessel sailed to Hawaii to begin RME's already booked trips. RME kept the same basic crew it was already using on the *Pacific Monarch*, which included McClung as the ship's master. All of the crew were RME employees, with four exceptions. Ware went as the ship's engineer. Ware also took Adventure Cruise employee Jamin Martinelli, who worked on his other vessel, hoping to "acclimate her into the engineer position." Martinelli was a licensed dive master, but Ware testified she did not go as dive master on the *Rapture*. McClung, however, testified Martinelli was the ship's dive master and as such she would have been responsible for any scuba diving operations (if there even were to be any) but she would have had nothing to do with any decisions regarding swimming, snorkeling, or free-diving excursions. Additionally, there was some question as to whether McClung's captain's license (a 100-ton near coastal license) allowed him to transport the *Rapture* across the open ocean to Hawaii. Accordingly, Ware's uncle, Jozeph Alfoldi, who had the higher level 1,600-ton license was the ship's master on the transport voyage, and he stayed on as a "second captain" once the vessel got to Hawaii. Ware's brother, Jason Ware (Jason), also a licensed captain, joined the ship in Hawaii as another "second captain" (first mate).

All witnesses who testified at trial as to the *Rapture*'s operations in Hawaii agreed McClung was the undisputed ship's master, Alfoldi and Jason served only as second captains. There was evidence that Jason made statements to Coast Guard officers after the drowning accident that led to this action, and in his deposition, indicating that although McClung was ship's master, Jason considered himself to be the person who was really "in charge" of the vessel because it belonged to his brother. But Jason testified at trial that McClung was indisputably in charge of the vessel during the trip and any authority Jason had was delegated to him by McClung as ship's master.

*The Accident*

In February 2007, RME was conducting a three-day excursion off the island of Lanai for a group of high school students and their chaperones. One

of the chaperones was the decedent, Jeremiah Johnson, a 36-year-old biology, marine biology, and ocean sciences teacher from the high school. Johnson had chaperoned other RME trips. Johnson was known to be an experienced "waterman," i.e., someone very proficient and comfortable in the ocean. He was a very strong swimmer, lifelong surfer (including big wave surfing), certified scuba diver, water polo player and experienced "free-diver" (i.e., diving without use of any underwater breathing apparatus).

The group was transported from the *Rapture* to the snorkeling site, Shark Fin Rock, in inflatable boats crewed by RME employees. The RME crew/lifeguards gave a safety briefing to the participants, which included that they could only swim on the inshore side of Shark Fin Rock (apparently, the seaward side had a steep dropoff and difficult currents), and that they must utilize the "buddy system" when diving.

Unexpectedly, as the crew was getting participants into the water on the inshore side of the boat, Johnson dove off the other side of the boat by himself toward the prohibited seaward side of Shark Fin Rock and swam down for a free-dive. He never came back up. The inflatable boats ferrying the group for the excursion did not have scuba gear on board. McClung and others who were still on board the *Rapture* quickly donned scuba gear, scrambled to the accident site, and found Johnson but could not revive him. Johnson drowned after he apparently suffered a "shallow water blackout" (loss of consciousness underwater).

*Procedure*

Johnson's widow, Sara Michelle Simmons, as special administrator of his estate, filed the instant wrongful death action. The complaint originally named only RME as a defendant; Ware and McClung were subsequently named as defendants by "Doe" amendments. (CME was also named a Doe defendant but later dismissed.) The complaint alleged RME negligently allowed Johnson to "take an unplanned, unsupervised free[-]dive" knowing such a dive exposed him to substantial risk of injury. At trial, Simmons presented evidence concerning the warnings given about the currents and the ocean topography around Shark Fin Rock, and the safety training and the safety protocols employed by the *Rapture*'s crew.

Simmons's complaint contained no allegations of a joint venture between Ware and McClung/RME or any allegations concerning their business relationship. The complaint did contain a single sentence allegation that "each [d]efendant was the agent and employee of every other co-[d]efendant, and . . . was acting in the scope and authority of said agency and employment . . . ." The existence of a joint venture was not mentioned in Simmons's opening argument or closing argument.

The trial court did not instruct the jury regarding the existence of a joint venture between Ware and McClung/RME. It was given Simmons's requested instructions that (1) "a corporation like [RME] can act only through its officers, or employees" and the negligence of a corporation's "officer, or employee" is imputed to the corporation, and (2) the parties agreed that at the time of Johnson's death the *Rapture* was owned by Ware and was being operated by RME and McClung, and Simmons claimed Johnson's death was caused by the negligence of all three defendants.[2] In closing arguments, Simmons argued Ware was liable as owner of the vessel. She argued that in Ware's rush to acquire the *Rapture*, because there was so little time between when he gained control of the vessel and when it had to be available to RME in Hawaii, Ware "did not have the opportunity to do what a reasonably prudent owner would have done" before allowing the vessel to be used for the kinds of excursions RME would be engaging in. Simmons argued that as owner of the vessel, Ware had a duty to ensure there were proper safety protocols and equipment in place. The special verdict form contained no questions regarding the existence of a joint venture between Ware and McClung/RME.

The jury returned the special verdict form finding RME, McClung, and Johnson were negligent, but finding Ware was not negligent. The jury found RME's and Johnson's negligence were the cause of Johnson's death, but McClung's negligence was not. The jury found the total damages were $7,559,508, and it apportioned 20 percent of the fault to RME and 80 percent of the fault to Johnson.

After the jury returned its special verdict, Simmons filed a motion for JNOV seeking entry of judgment against Ware. Simmons argued the uncontroverted evidence at trial showed Ware and RME were in a joint venture and thus Ware was vicariously liable for any judgment against RME. Ware opposed the motion arguing the issue of the existence of a joint venture involved questions of fact that were never presented to the jury.

At the hearing on the motion, the trial court began by inquiring if the JNOV motion was proper given that Ware "never had a chance to present evidence on the [joint venture] issue." Simmons's counsel replied the existence of a joint venture was raised by virtue of her complaint's general allegation of agency (i.e., that every defendant was the agent and employee of every other defendant). Simmons argued that because the evidence pointing to the existence of a joint venture between Ware and RME was undisputed,

---

[2] Neither the reporter's transcript nor the parties' joint appendix contain the jury instructions given in this case. We notified the parties of our intention to augment the record on our own motion with the jury instructions (Cal. Rules of Court, rule 8.155(a)), and they did not object. Accordingly, we augment the record on our own motion to include the jury instructions given.

she did not have to present the issue to the jury. Simmons argued she could have brought a motion for directed verdict on the joint venture issue before the matter went to the jury, and the court would have had to grant the motion because of the undisputed evidence. Accordingly, she could bring a motion for JNOV after the jury verdict was returned, without having raised the issue earlier. Ware responded that had the joint venture issue been raised at trial (or by way of a motion for directed verdict), he would have presented evidence regarding the business relationship between Ware and RME. In particular, he would have presented affirmative evidence there was no agreement he was to share in the profits or losses of RME, and he had no control over RME's business or how the trips were operated. The trial court took the matter under submission.

On August 30, 2011, the trial court issued its ruling granting Simmons's motion for JNOV. The court found as a matter of law Ware and RME were engaged in a joint venture at the time of Johnson's death because there was "undisputed evidence at trial that Ware and RME intended to engage in a single enterprise when they embarked for Hawaii together aboard the vessel [*Rapture*], that they intended to share profits, that they shared a community of interests, and that they exercised joint control over the venture."

On September 29, 2011, the court entered judgment on the special verdict awarding Simmons $1,607,469.69 against Ware and RME, plus prejudgment interest and postjudgment interest. The judgment also awarded costs under Code of Civil Procedure section 998 against Ware in an amount the court would later determine. Ware's notice of appeal from the judgment was filed October 6, 2011 (case No. G045886).

Simmons's memorandum of costs, filed before the judgment was entered, requested Code of Civil Procedure section 998 costs (expert witness fees) of $193,997.61 against Ware. Ware's motion to tax those costs was denied on November 29, 2011. On December 28, 2011, Ware filed a second notice of appeal from that order (case No. G046287). After the briefing was completed in both appeals, the parties stipulated to consolidate the appeals and we accepted that stipulation.

## DISCUSSION

### A.  *Mootness*

In her respondent's brief in case No. G046287, at footnote 1, Simmons suggested both appeals are moot because of a partial settlement agreement, but rather than analyze the issue Simmons states she raised the point so we could "ponder the matter on [our] own." Ware did not address the issue in his

reply brief. We directed the parties to submit supplemental letter briefs addressing the issue, which they have.

The settlement agreement, titled "Long Form Settlement and Release Agreement" (hereafter the Settlement Agreement), was entered into on July 5, 2011, the day *before* the jury returned its special verdict finding Ware was *not* negligent. The 19-page Settlement Agreement is complicated and involved numerous parties including Simmons; RME and McClung; CME; Ware and his insurer, American Home Assurance Company (American Home); the entities that purchased the *Rapture* from Ware after Johnson's death and the vessel itself (the *Rapture* was then renamed the *Safari Explorer*, but we continue to refer to the vessel as the *Rapture*); and the school at which Johnson worked and its insurance carrier. The Settlement Agreement identified numerous pieces of litigation and proceedings arising out of Johnson's death including the instant wrongful death action; an in rem action against the *Rapture* filed in federal court in Washington state that had already been dismissed;[3] a state workers' compensation claim; and a claim for benefits under the Longshore and Harbor Workers' Compensation Act (33 U.S.C. § 906(c)).

As relevant to these appeals, the Settlement Agreement explains that Ware had two liability policies through American Home—primary and excess. American Home was providing a defense to Ware, RME, and McClung under a reservation of rights. American Home had commenced two declaratory relief actions in federal court seeking to determine the extent of its coverage obligations under the primary and excess policies, both of which were stayed pending the outcome of this wrongful death action. The Settlement Agreement, sometimes referred to by the parties as a "high-low" agreement, provided that American Home would pay Simmons $1 million regardless of

---

[3] The concept that the vessel itself may be sued and is subject to "arrest" is unique to maritime law. As explained in *Crimson Yachts v. Betty Lyn II Motor Yacht* (11th Cir. 2010) 603 F.3d 864, 868: "An *in rem* admiralty proceeding requires as its basis a maritime lien. [Citation.] 'A maritime lien is a special property right in a ship given to a creditor by law as security for a debt or claim,' and it attaches 'the moment the debt arises.' [Citation.] Maritime liens differ from other common law liens in that a maritime lien is 'not simply a security device to be foreclosed if the owner defaults'; rather, a maritime lien converts the vessel itself into the obligor and allows injured parties to proceed against it directly. [Citation.] This is called an *in rem* proceeding. 'An *in rem* suit against a vessel is . . . distinctively an admiralty proceeding, and is hence within the exclusive province of the federal courts.' [Citation.] [¶] Federal district courts obtain *in rem* jurisdiction over a vessel when a maritime lien attaches to it. [Citation.] Upon filing an *in rem* complaint, the clerk of court issues a warrant for the arrest of the *res*. [Citation.] The *res* remains in the court's custody during the proceeding [and] serves as both the respondent and the subject matter. [Citation.]" (See *Hawkspere Shipping Co., Ltd. v. Intamex, S.A.* (4th Cir. 2003) 330 F.3d 225, 230, fns. 3 & 4 [maritime lien a privileged claim upon vessel arising out of services rendered to or injuries caused by it; " 'arrest' " is formal procedure by which vessel brought within in rem jurisdiction of admiralty court].)

the jury's verdict in this wrongful death action; Simmons would dismiss both workers' compensation claims; and American Home would dismiss the federal court declaratory relief action relating to the primary policy. The wrongful death action would continue to verdict, and American Home would continue to litigate coverage under the excess policy in the federal court action. If Simmons obtained a judgment against Ware, McClung, or RME for more than $1 million, she could only recover up to an additional $1.5 million, but no more than that, and she would look only to the excess policy to satisfy that judgment (depending on the outcome of the federal court declaratory relief action)—Simmons expressly agreed she would not execute any judgment against the judgment debtors themselves. The parties expressly agreed they *did not* waive any rights to appeal the judgment in this action. After entering into the Settlement Agreement, and after the jury returned its verdict finding Ware was not negligent, Simmons brought her motion for JNOV against Ware.

Simmons contends the appeals are moot because of the Settlement Agreement. Simmons argues that because she is contractually precluded from executing on the judgment against Ware individually, and she can only recover from his excess policy with American Home, there is no effective relief we can grant Ware. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214 [130 Cal.Rptr.2d 564] [" 'When no effective relief can be granted, an appeal is moot and will be dismissed.' "]) Simmons claims, "Ware mooted his right to appeal [the] JNOV when he signed off on [the] Settlement Agreement . . . ."

We agree with Ware the appeals are not moot because Ware is aggrieved by the judgment against him. Any party aggrieved may appeal (Code Civ. Proc., § 902), and a party is considered "aggrieved" when its rights or interests are injuriously affected by the judgment. (*Marsh v. Mountain Zephyr, Inc.* (1996) 43 Cal.App.4th 289, 295 [50 Cal.Rptr.2d 493].) The adverse effect " ' "must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment." ' " (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953].)

Preliminarily, the Settlement Agreement specifically preserved the parties' right to appeal; it is unconscionable for Simmons to have accepted the benefits of her contract with Ware and now attempt to deprive him of the protections he specifically bargained for. Moreover, even though Simmons agreed she would look only to Ware's excess insurance limits to satisfy any judgment she obtained, Ware is nonetheless aggrieved by the judgment against him. "[A]lthough the covenant not to execute eliminated personal financial exposure for the judgments, the personal judgments still stand and can adversely affect the future credit and business transactions of the

insureds. (See *Consolidated American Ins.* v. *Mike Soper Marine* (9th Cir. 1991) 951 F.2d 186, 190–191; *Critz* v. *Farmers Ins. Group* [(1964) 230 Cal.App.2d 788], 803 [41 Cal.Rptr. 401].)" (*McLaughlin v. National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132, 1154 [29 Cal.Rptr.2d 559].) Additionally, the judgment finding Ware and RME were joint venturers as a matter of law, and that Ware is vicariously liable for judgments against RME, could have potential collateral estoppel ramifications in other litigation arising out of RME's use of the *Rapture*. (See generally *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 943 [38 Cal.Rptr.3d 220, 126 P.3d 1040] [discussing requirements for application of doctrine of collateral estoppel to preclude relitigation of issues decided in prior proceedings].) Accordingly, we reject Simmons's assertion the appeals are moot.

### B. *Maritime Wrongful Death Actions*

■ We turn then to the substantive issues. As explained in a leading treatise on maritime law, in *Moragne v. States Marine Lines* (1970) 398 U.S. 375, 377–388 [26 L.Ed.2d 339, 90 S.Ct. 1772] (*Moragne*), the United States Supreme Court approved of a cause of action for wrongful death "under the general maritime law 'for death caused by violation of maritime duties.' " (Schoenbaum, Admiralty and Maritime Law (5th ed. 2011) § 8-3, p. 671, fn. omitted.) *Moragne* concerned only wrongful death actions in the context of a death covered by the Death on the High Seas Act (DOHSA) (46 U.S.C. former § 761 et seq. [a marine league from the shore of any state], or the Jones Act (46 U.S.C former § 688 [seafarer's right of recovery against his or her maritime employer].) Eventually, "[i]n *Yamaha Motor Corporation v. Calhoun* [(1996) 516 U.S. 199 [133 L.Ed.2d 578, 116 S.Ct. 619], the Supreme Court held when a nonseafarer (a person who is neither a seaman nor a longshoreman) is killed within state waters (generally within three nautical miles of shore), the remedies applicable under the general maritime law . . . can be supplemented by state law remedies, including state statutory wrongful death and survival remedies. A limit on the applicability of such state law remedies, however, is that they do not conflict with or alter the essential character of maritime law. As to seafarers, state law continues to be pre-empted." (Schoenbaum, Admiralty and Maritime Law, *supra*, § 8-3, p. 677.)

Accordingly, this action involving the death of a nonseafarer within state waters is the kind envisioned by *Yamaha*, i.e., a maritime wrongful death action supplemented by state law wrongful death and survival remedies. The state court has jurisdiction because although "Article III of the United States Constitution gives federal courts exclusive jurisdiction over all admiralty and maritime matters, . . . 28 United States Code section 1333(1) grants state courts concurrent jurisdiction under the so-called 'saving to suitors clause.' This clause provides for *in personam* remedies which 'means that an injured

party may have claims arising from a single accident under both federal maritime and state common or statutory law. State remedies under the savings to suitors clause may be pursued in state court or, if there is a basis for federal jurisdiction, in federal court. [Citation.] A maritime claim brought in the common law state courts is governed by federal maritime law, however.' [Citation.] This is sometimes referred to as the reverse-*Erie* doctrine." (*Price v. Connolly-Pacific Co.* (2008) 162 Cal.App.4th 1210, 1213–1214 [76 Cal.Rptr.3d 872], fn. omitted & italics added (*Price*).)

"The *Erie* doctrine (*Erie R. Co. v. Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817]) requires that a federal court sitting in diversity jurisdiction over a state law claim must apply state substantive law in resolving a dispute. However, the extent to which state law may be used to remedy *maritime* injuries is constrained by a so-called reverse-*Erie* doctrine which requires that substantive remedies afforded by the states conform to governing federal maritime standards. [Citation.]" (*Price, supra,* 162 Cal.App.4th at p. 1214, fn. 1.) But even when an action is founded on federal law, when brought in state court "the law of the state controls in matters of practice and procedure unless the federal statute provides otherwise. [Citation.]" (*Scruton v. Korean Air Lines Co.* (1995) 39 Cal.App.4th 1596, 1603 [46 Cal.Rptr.2d 638].)

## C. *The JNOV*

Ware contends granting the JNOV was improper for at least two reasons. First, it was procedurally improper to grant JNOV on an issue that was never pleaded, argued, or presented to the jury. Second, even if procedurally proper, JNOV was inappropriate because the evidence did not establish Ware and RME were engaged in a joint venture as a matter of law. We agree on both points.

Code of Civil Procedure section 629 provides in pertinent part: "The [trial] court, before the expiration of its power to rule on a motion for a new trial, either of its own motion . . . or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made."

" 'The trial court's discretion in granting a motion for judgment notwithstanding the verdict is severely limited.' [Citation.] ' "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict [citations]. The trial judge cannot reweigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn,

the motion for judgment notwithstanding the verdict should be denied. [Citations.] 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" ' [Citation.]" (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d 266] . (*Hansen*).) "On review of an order granting JNOV, we ' "must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict. [Citation.]" ' [Citation.]" (*Ibid.*)

## 1. Procedural Problems

We agree with Ware the JNOV is procedurally infirm because the issue of joint venture liability was not pleaded in the complaint, presented at trial, or submitted to the jury. *Hansen, supra*, 55 Cal.App.4th 1497, is instructive. In that products liability case, the jury returned a defense verdict finding no liability on the part of the defendant manufacturer of a household cleanser. In response to the plaintiffs' motion for new trial, the trial court granted the plaintiffs a partial JNOV on its own motion on the issues of liability and comparative fault and granted a new trial on damages only. (*Id.* at pp. 1501, 1508–1509.) The appellate court reversed the JNOV on both issues because there was a conflict in the evidence but also, with regards to the comparative fault issue, because of "multiple procedural problems" with the JNOV. (*Id.* at p. 1511.) The issue of comparative fault was not raised in the plaintiffs' moving papers on their new trial motion, and the jury had "never reached the question of comparative fault, because the special verdict form told them they need go no further if they found (as they did) that there was no design defect. The trial court never gave notice it intended to rule on this issue on its own motion. These reasons provide ample grounds for reversal." (*Id.* at p. 1511.)

Although the procedural defects are somewhat different in this case, they similarly compel reversal. We begin with the fact Simmons's complaint contained no allegations regarding the existence of a joint venture between Ware and RME/McClung or in any way suggested that was asserted as a basis for Ware's liability.

"The pleadings are supposed to define the issues to be tried." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶ 6:8, p. 6-2 (rev. # 1, 2011).) Simmons's complaint contained no allegations that would have supported a joint venture theory of liability on Ware's part. (*Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1091 [111 Cal.Rptr.3d 165] [all joint venturers jointly and severally liable for venture's

obligations].) In fact, it contained no allegations whatsoever about the relationship between Ware and RME. The complaint contained a generic boilerplate allegation that "each [d]efendant was the agent and employee of every other [co-d]efendant,"—the kind of "secondary-liability allegation[]" our Supreme Court has derided as "egregious examples of generic boilerplate." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 134, fn. 12 [271 Cal.Rptr. 146, 793 P.2d 479].)

In *Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 370–371 [76 Cal.Rptr.3d 146] (*Unruh-Haxton*), this court found the complaint was adequate to allege the existence of a joint venture. We observed, " 'There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership interest in the enterprise. [Citation.]' [Citation.]" (*Id.* at p. 370.) In *Unruh-Haxton*, facts establishing at least two of the three requisite elements of a joint venture were specifically plead in the complaint and the third element could be inferred from those alleged facts. That is a far cry from the complaint before us, which contained no facts whatsoever even hinting at a joint venture theory.

Simmons offers no explanation as to how her complaint's boilerplate employee/agent allegation sufficed to put Ware on notice she claimed Ware and RME were joint venturers. Indeed, we note "the relationships of employer-employee and joint adventurers are incompatible and cannot exist together between the same parties in relation to the same transaction. [Citations.]" (*Wiltsee v. California Emp. Com.* (1945) 69 Cal.App.2d 120, 127 [158 P.2d 612]; see *Bunn v. Lucas, Pino & Lucas* (1959) 172 Cal.App.2d 450, 465 [342 P.2d 508], disapproved on another ground in *Chambers v. Kay* (2002) 29 Cal.4th 142, 155, fn. 8 [126 Cal.Rptr.2d 536, 56 P.3d 645].) Rather, Simmons argues Ware has waived any challenge to the adequacy of her complaint to put the existence of a joint venture at issue because he failed to demurrer to the complaint, leading her to assume her allegations were sufficient to give Ware notice of the joint venture issue. Not surprisingly, Simmons cites no authority suggesting a defendant must challenge the adequacy of a complaint to raise a claim not alleged therein.

Simmons also argues Ware waived any argument as to the adequacy of her complaint to allege a joint venture because he did not specifically attack the pleading in his opposition to her motion for JNOV. She points out that at the hearing, when the trial court asked if Ware had notice of the joint venture issue, her counsel replied it was raised by way of the employee/agent allegation and Ware's counsel did not argue otherwise. But a review of Ware's opposing papers makes clear he was opposing the motion for JNOV

on the grounds he had no notice of the joint venture issue and no opportunity to present evidence to defend against it. And in any event, the adequacy of the pleadings to raise the claim is a question of law that may be considered for the first time on appeal. (*Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 259 [108 Cal.Rptr.2d 739].) Simmons's complaint was wholly inadequate to raise a joint venture and at no time did she seek to amend her complaint to conform to proof.

We turn next to the fact the joint venture issue was never argued by Simmons at trial and was not submitted to the jury. Simmons did not request jury instructions on joint venture, and the jury was not asked to make any such findings in the special verdict form. It was only after the jury returned its special verdict finding Ware (as owner of the vessel) was not negligent that Simmons for the first time asserted there was a joint venture making Ware vicariously liable for RME's negligence.[4]

Ware contends granting JNOV on an issue that was never submitted to the jury is inappropriate. Simmons counters she was not required to present the issue to the jury because if the evidence established a joint venture as a matter of law, she could have moved for a directed verdict in her favor on that issue. (Code Civ. Proc., § 630.) And if she would have prevailed on a motion for directed verdict, then she is entitled to a JNOV on the issue. (Code Civ. Proc., § 629; *Garretson v. Harold I. Miller* (2002) 99 Cal.App.4th 563, 568 [121 Cal.Rptr.2d 317] [trial court's power to grant JNOV identical to power to grant directed verdict].) Citing Code of Civil Procedure section 629's language that the court may grant JNOV to "a party against whom a verdict has been rendered," Simmons argues the only "precondition" for granting a JNOV is that the jury have reached any valid verdict, not that it reached a verdict on the particular claim or issue on which JNOV is later sought.

---

[4] For this reason we reject Simmons's attempt to invoke the "theory of trial" doctrine and her reliance on *Jones v. Dutra Construction Co.* (1997) 57 Cal.App.4th 871 [67 Cal.Rptr.2d 411] (*Jones*). "The doctrine of theory of trial is related to the doctrines of waiver and invited error. [Citation.] It holds that '[w]here the parties try the case on the assumption that a cause of action is stated, that certain issues are raised by the pleadings, that a particular issue is controlling, or that other steps affecting the course of the trial are correct, neither party can change this theory for purposes of review on appeal.' [Citation.]" (*State Compensation Ins. Fund v. Superior Court* (2010) 184 Cal.App.4th 1124, 1130 [109 Cal.Rptr.3d 88].) In *Jones, supra*, 57 Cal.App.4th 871, the plaintiff waived his claim on appeal that the defendant's summary judgment motion was improperly granted because the affirmative defense it raised had not been plead in the defendant's answer. The court observed the plaintiff had "responded to the summary judgment motion on the merits, never claiming [the defendant's] answer was defective or insufficient to support the summary judgment motion." (*Id.* at p. 876.) By contrast, here the existence of a joint venture was never raised during trial, never mentioned in argument, and never presented to the jury. When it was raised by Simmons's motion for JNOV, Ware strenuously objected on the grounds he was never put on notice joint venture was a theory of liability.

But Code of Civil Procedure section 630 presupposes the directed verdict is sought on an issue that was presented at trial and on which the opposing party had an opportunity to present evidence. (See, e.g., Code Civ. Proc., § 630, subd. (b) ["If it appears that the evidence presented supports the granting of the motion as to some, but not all, of *the issues involved in the action*, the court shall grant the motion *as to those issues* and the action shall proceed on any remaining *issues*. . . ." (italics added)].) Had Simmons moved for directed verdict on the issue of whether Ware and RME were in a joint venture, Ware certainly would have had good cause to seek to reopen evidence to rebut that claim. (*Sanchez v. Bay General Hospital* (1981) 116 Cal.App.3d 776, 793 [172 Cal.Rptr. 342] [trial court has discretion to reopen for further evidence upon showing of good cause].)

Pointing to the evidence Simmons argues supports the conclusion Ware and RME were in a joint venture, she urges it was (or should have been) clear to Ware that a joint venture was being asserted, despite the complete absence of any specific mention of that theory at any point until after the jury returned its special verdict. But the evidence she discusses went to Ware's liability as *owner* of the *Rapture* (see *Rainey v. Paquet Cruises, Inc.* (2d Cir. 1983) 709 F.2d 169, 171–172 [owner of ship in navigable waters owes passengers duty of reasonable care under the circumstances]), and thus its existence would not necessarily have alerted Ware that Simmons contended he was in a joint venture with RME. Indeed, not only was the jury not instructed it could find Ware vicariously liable for RME's negligence as a joint venturer, the jury was given an instruction that specifically differentiated between Ware as *owner* of the *Rapture* on the one hand, and RME/McClung as the *operator* at the time of the accident on the other. In opening and closing arguments, Simmons argued Ware's liability as owner of the vessel, not as a joint venturer with RME. In sum, we conclude there was a complete lack of notice to Ware he was alleged to be in a joint venture with RME, and accordingly, the JNOV was procedurally improper.

## 2. *Conflicting Evidence*

We also find merit in Ware's argument JNOV was inappropriate because there was conflicting evidence as to whether Ware and RME were joint venturers.

In *Unruh-Haxton, supra,* 162 Cal.App.4th at page 370, this court explained " 'A joint venture . . . is an undertaking by two or more persons jointly to carry out a single business enterprise for profit.' [Citation.] 'There are three basic elements of a joint venture: the members must have joint control over the venture (even though they may delegate it), they must share the profits of the undertaking, and the members must each have an ownership

interest in the enterprise. [Citation.]' [Citation.] 'Whether a joint venture actually exists depends on the intention of the parties. [Citations.] [¶] . . . [¶] . . . [W]here evidence is in dispute the existence or nonexistence of a joint venture is a question of fact to be determined by the jury. [Citation.]' [Citation.]" (See *County of Riverside v. Loma Linda University* (1981) 118 Cal.App.3d 300, 313 [173 Cal.Rptr. 371] [joint venture a question of fact unless "there is no conflicting extrinsic evidence concerning the interpretation of the contract creating the relationship . . ."].)

Consistent with that rule, CACI No. 3712 specifies four requisites to establishing the existence of a joint venture: "Each of the members of a joint venture, and the joint venture itself, are responsible for the wrongful conduct of a member acting in furtherance of the venture. [¶] You must decide whether a joint venture was created in this case. A joint venture exists if all of the following have been proved: [¶] [(1)] Two or more persons or business entities combine their property, skill, or knowledge with the intent to carry out a single business undertaking; [¶] [(2)] Each has an ownership interest in the business; [¶] [(3)] They have joint control over the business, even if they agree to delegate control; and [¶] [(4)] They agree to share the profits and losses of the business. [¶] A joint venture can be formed by a written or an oral agreement or by an agreement implied by the parties' conduct." Ware argues each essential element of the joint venture must be proven. And, he asserts here there was either no evidence or conflicting evidence as to some of the elements of a joint venture. Therefore, either a joint venture was not conclusively established, or it was a question of fact.

Simmons argues we must apply *federal maritime law* to the question of whether there was a joint venture.[5] She points to maritime cases that articulate the same basic factors as California law for establishing a joint venture but analyze the factors utilizing a "totality of the circumstances" test. For example, *Hannah Brothers v. OSK Marketing & Communications, Inc.* (S.D.N.Y. 2009) 609 F.Supp.2d 343, 348–349 (*Hannah Brothers*) explained, "A joint venture is '[a] business undertaking by two or more persons engaged in a single defined project.' [Citation.] A joint venture is a *contractual* undertaking: 'Joint venture status is created by contract, express or implied, and depends on the mutual intent of the parties.' [Citations.] [¶] While the law is not entirely consistent from jurisdiction to jurisdiction [citation], five factors generally determine whether two or more persons have entered into a joint venture. They are: [¶] (i) whether the putative joint venturers entered into a specific agreement to carry on an enterprise for profit; [¶] (ii) whether their agreement evidenced an intent to be joint venturers; [¶] (iii) whether

---

[5] We note in the trial court Simmons specifically argued, consistently with Ware's position on appeal, that California law applies: "[w]e respectfully submit that [the trial court] should determine the existence of a joint venture under California law."

each putative joint venturer made a contribution of property, financing, skill, knowledge, or effort to the alleged joint venture; [¶] (iv) whether each putative joint venturer exercised some degree of control over the venture; and [¶] (v) whether the putative joint venturers agreed to share the profits and losses of the venture. [Citations.]"[6] Under these federal authorities, the existence of a joint venture is generally a question of fact, determined from the totality of the circumstances, with no one aspect of the legal test playing a decisive role. (*Sasportes v. M/V Sol de Copacabana* (5th Cir. 1978) 581 F.2d 1204, 1208; *Hannah Brothers, supra*, 609 F.Supp.2d at p. 349; *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping* (D.N.J. 1985) 611 F.Supp. 665, 679; *Cashman Equipment Corp. v. Trans. Caribbean Transport Co.* (E.D.La., Oct. 29, 1996, No. 96-3116) 1996 WL 626294.)

We need not belabor whether state law or federal maritime law controls, as for our purposes here they are not inconsistent. The gist of the requisite elements for a joint venture are the same no matter how they are articulated: "A joint venture exists when there is 'an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control.' " (*Connor v. Great Western Sav. & Loan Assn.* (1968) 69 Cal.2d 850, 863 [73 Cal.Rptr. 369, 447 P.2d 609] (*Connor*); see CACI No. 3712.) Simmons acknowledges most of the federal cases she cites apply state law in setting forth the elements of a joint venture. (See *Wilburn Boat Co. v. Fireman's Ins. Co.* (1955) 348 U.S. 310, 313–314 [99 L.Ed. 337, 75 S.Ct. 368] [admiralty courts borrow analogous state court jurisprudence in absence of established maritime rule]; *ITEL Containers Internat. v. Atlanttrafik Express Service Ltd.* (2d Cir. 1990) 909 F.2d 698, 701 [applying N.Y. law]; *Lyon v. Ranger III* (1st Cir. 1988) 858 F.2d 22, 27 [applying Mass. law]; *Rowe v. Brooks* (4th Cir. 1964) 329 F.2d 35, 40–41 [applying Va. law]; *Hannah Brothers, supra*, 609 F.Supp.2d at pp. 348–349 [looks to various states' formulations]; *Bay Casino, LLC v. M/V Royal Empress* (E.D.N.Y. 1998) 20 F.Supp.2d 440, 449 (*Bay Casino*) [applying N.Y. law]; *Hellenic Lines, Ltd. v. Commodities Bagging & Shipping, supra*, 611 F.Supp. at p. 679 [applying N.J. law]; see also *Basel v. Westward Trawlers*

---

[6] Similarly, in *Trans-Tec Asia v. M/V Harmony Container* (C.D.Cal. 2005) 435 F.Supp.2d 1015, 1031–1032, the court noted, " 'Federal courts sitting in admiralty generally apply federal common law when examining corporate identity.' [Citation.] Although there appears to be no federal appellate case on point in which the elements of a joint venture under federal common law are spelled out, 'different jurisdictions generally adopt the same criteria for the establishment of a joint venture.' [Citation.] Accordingly, since the parties appear to agree on the applicable test, the Court will apply the elements set forth by the Second Circuit: (1) a specific agreement to carry on an enterprise for profit; (2) an intent to be joint venturers; (3) mutual contributions of financing, skill, property, knowledge, or effort; (4) some degree of joint control over the venture; and (5) a provision for the sharing of both profits and losses. [Citation.]" (Fn. omitted.)

*Inc.* (Alaska 1994) 869 P.2d 1185, 1190 ["maritime courts apply the relevant state's law regarding joint venture . . ."].)

■ The distinction with which Simmons hopes to prevail is that the federal cases utilize a "totality of the circumstances" analysis, which she suggests is somehow less stringent than state law. We disagree. The requisite elements are still the requisite elements, and none of the cases Simmons cites holds a joint venture is established *as a matter of law* when one or more of the required elements are missing, or when there is conflicting evidence as to one or more of the elements. Indeed, *Shell Oil Co. v. Prestidge* (9th Cir. 1957) 249 F.2d 413, 415–416, a case relied upon by Simmons identifies the elements as all being *essential* to establishing a joint venture: "A joint adventure has been broadly defined as an association of two or more persons who combine their property, money, efforts, skill or knowledge to carry out a single business enterprise with the objective of realizing a profit. [Citations.] While the Courts have not laid down a more precise, all-embracing definition of the relationship, they have in various cases recognized certain elements as being essential to the existence of it. Thus a contract between the parties, a common purpose, a community of interest, mutual control over the subject matter of the enterprise or over the property engaged therein, have been held to be elements necessary to the existence of a joint venture. [Citations.] Contribution by the parties of property, money, efforts, skill or knowledge to the common enterprise is also essential, but their contribution need not be equal or of the same character. [Citations.] Agreement to share in the profits and losses of the enterprise is also essential to a joint venture, although there is some authority to the effect that the sharing of losses is not necessary. [Citations.] Finally, the intent of the parties is controlling but as to third persons, the legal and not the actual intent controls. [Citations.]" (See, e.g., *Bay Casino, supra,* 20 F.Supp.2d at pp. 448–449 [no joint venture because two of the five essential factors were missing—sharing of losses and mutual intent to be in joint venture agreement].)

Here, conflicting evidence as to at least two of the requisite elements for a joint venture precludes finding that, as a matter of law, Ware and RME were joint venturers in conducting the trip during which Johnson died. It was at best a question of fact that should have been presented to the jury for resolution.

First, the evidence at trial did not conclusively demonstrate there was an agreement between Ware and RME to share in profits and losses. Simmons argues Ware shared in the profits via the $5,000 a day charter fee RME paid Ware for use of the *Rapture,* and RME shared in the profits via the fares it received. Moreover, Simmons argues, Ware admitted his primary motivation in acquiring the *Rapture* was that he could then charter it back to RME (i.e.,

Ware would have a guaranteed customer) and he envisioned having a long business relationship with RME. Simmons also argues Ware agreed to share in the venture's losses because in the CME Purchase Agreement, he agreed to hold CME harmless for any liability CME had for booking deposits already received by RME for trips on the *Rapture*. And Ware agreed to be responsible for all the costs associated with owning, maintaining, and operating the vessel during the five-year charter period.

We do not believe these facts suffice to support a finding as a matter of law that Ware and RME agreed to *share* in the profits or losses of a single business venture as opposed to merely showing that each of their successes was entwined with the success of the other. For example, in *Connor, supra,* 69 Cal.2d at page 863, the Supreme Court stated that although the profits of the alleged joint venturers "were dependent on the overall success of the development, neither was to share in the profits or the losses that the other might realize or suffer. Although each received substantial payments as seller, lender, or borrower, neither had an interest in the payments received by the other. Under these circumstances, no joint venture existed." (Fn. omitted.) The "profits" of a business generally " 'signifies an excess of the value of returns over the value of advances,' or . . . 'the excess of receipts over expenditures,' or . . . 'the receipts of a business, deducting current expenses; it is the equivalent to net receipts.' " (*Howard v. D.W. Hobson Co.* (1918) 38 Cal.App. 445, 451 [176 P. 715], citations omitted.)

Here, there is no evidence Ware had an interest in RME's profits (i.e., the fares it received less its business expenses in operating the trips). The only evidence is that Ware was paid $5,000 a day for RME's use of the *Rapture*, out of which Ware had to pay all of his expenses associated with acquiring and operating the vessel (including the monthly mortgage payment, insurance, maintenance, fuel, etc.), and RME had to pay the charter fees regardless of its own income or expenses.

Additionally, Ware's agreement to hold CME harmless for any liability CME might have for booking deposits that had already been paid to RME for trips on the *Rapture* before CME cancelled the original charter with RME, does not establish Ware agreed to share in *RME*'s losses. We note that under maritime law if RME defaulted on those cruise obligations, and could not refund customers deposits, those deposits might have resulted in a maritime lien against the *Rapture*. (See fn. 3, *ante*; *BargeCarib Inc. v. Offshore Supply Ships Inc.* (5th Cir. 1999) 168 F.3d 227, 230 [maritime lien/in rem action directly against vessel when owner allegedly failed to deliver it for the contracted charter].) Indemnifying CME, title owner of the *Rapture*, against CME's or the vessel's potential liability if RME was unable to fulfill its existing contracts, does not evidence an agreement that Ware and RME

agreed to share in RME's losses or to in any way indemnify RME for its liability for those deposits. In short, the evidentiary record was insufficient to support a finding that, as a matter of law, Ware and RME had an understanding to share profits and losses from the trips.

■ We turn next to the element of joint control. " 'An essential element of a partnership or joint venture is the right of joint participation in the management and control of the business. [Citation.] Absent such right, the mere fact that one party is to receive benefits in consideration of services rendered or for capital contribution does not, as a matter of law, make him a partner or joint venturer. [Citations.]' " (*Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 586 [42 Cal.Rptr.2d 510]; see *Orosco v. Sun-Diamond Corp.* (1997) 51 Cal.App.4th 1659, 1666 [60 Cal.Rptr.2d 179] [basic element of joint venture is members must have joint control over venture, even though they may delegate it].)

*Simmons* argues Ware exercised joint control over RME's marine education trips because he maintained control over the *Rapture* during the trips—Ware was responsible for maintenance and repair, insurance, fueling, served as ship's engineer, and provided three of the ship's crew members. But Ware's maintaining some degree of control over the *Rapture* as its de facto owner, does not equate to joint control, as a matter of law, over RME's marine education trips making Ware RME's joint venturer vicariously liable for RME's own negligence.

As explained above (see fn. 1, *ante*,) vessel charters are generally of two types: (1) a time or voyage in which the vessel owner retains possession and control and (2) demise or bareboat in which the charterer takes complete control of the vessel and is treated by law as it legal owner. (*Walker, supra*, 995 F.2d at pp. 80–81.)

■ Ware acquired the *Rapture* from CME under what is undisputedly a demise charter, taking complete control and responsibility for the vessel. Ware then subchartered the *Rapture* to RME. Ware suggests the subcharter to RME was also in the nature of a demise charter, because RME provided a ship's master (McClung), and most of the crew, supplies, and equipment for the trips. Generally, in the case of a demise charter, the charterer (in this case RME) is "liable *in personam* for all liabilities arising out of the operation of the vessel." (Schoenbaum, Admiralty and Maritime Law, *supra*, § 11-18, p. 52, fns. omitted.)

Simmons argues the charter arrangement between Ware and RME was a nondemise charter, more akin to a time charter, because Ware maintained a degree of control over the vessel. "In a non-demise charter, the charterer is

normally not liable to crew members for unseaworthiness or operating negligence. Where, however, the charterer is actively negligent or undertakes operating functions on the vessel, he will be liable for injuries resulting from its own acts." (Schoenbaum, Admiralty and Maritime Law, *supra*, § 11-18, pp. 54–55, fns. omitted.)

But even accepting Simmons's characterization of the charter arrangement between Ware and RME as a nondemise charter, it does not win the day for her. Characterization of the charter only guides the extent to which the owner might be liable for operational negligence. That was litigated in this case, and Ware was found to have not breached his duty of care as *owner* of the *Rapture* and Simmons has not challenged that finding. Simmons does not cite, and we have not found, any case holding that as a matter of law a ship owner under a nondemise charter is in a joint venture with the charterer making the ship owner vicariously liable for the charterer's own negligence.

There is no evidence in the record suggesting Ware had involvement or control over RME's business in conducting educational charters such as bookings, establishing itinerary for the trips, or designing the educational programs. Ware chartered his other vessel to RME and chartered both his ships to other companies for similar educational trips. Simmons makes much of Ware's brother Jason's deposition testimony that he considered himself to be in charge of the *Rapture* at the time of Johnson's accident because his brother owned the vessel, which conflicted with his trial testimony that McClung was master of the vessel. At best the evidence demonstrates a conflict as to the control Ware maintained over the vessel; it does not demonstrate as a matter of law joint control for the purposes of placing Ware and RME in a joint venture.

In conclusion, there was conflicting evidence as to at least two of the essential elements of a joint venture: sharing of profits and losses and joint control. Accordingly, the trial court erred by finding that as a matter of law Ware and RME were conducting a joint venture and the judgment must be reversed. In view of that conclusion, we need not consider whether there was also conflicting evidence as to the other essential elements of a joint venture.

D. *Consolidated Appeal G046287: Code of Civil Procedure Section 998 Costs*

Ware separately appeals the postjudgment order concerning the award of $193,997.61 in expert witness costs to Simmons, awarded against Ware only, pursuant to Code of Civil Procedure section 998. " 'An order awarding costs falls with a reversal of the judgment on which it is based. [Citation.]' [Citation.]" (*County of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476,

1501 [82 Cal.Rptr.3d 38].) Because we conclude the judgment against Ware must be reversed, the order awarding costs against him must also be reversed. (*Ibid.*)

## DISPOSITION

The judgment and award of costs against Ware is reversed, and the trial court is directed to enter judgment for Ware. Ware shall recover his costs on appeal.

Bedsworth, J., and Moore, J., concurred.

A petition for a rehearing was denied March 13, 2013, and the opinion was modified to read as printed above.